<u>NOT FOR PUBLICATION</u>

**UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF OKLAHOMA**

Filed / Docketed
August 17, 2007

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| BURD, BRYAN AND MANDY, | ) | Case No. 05-19991-R |
| | ) | Chapter 7 |
| Debtors. | ) | |

| | | |
|---|---|---|
| EXCHANGE BANK, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Adv. No. 06-01133-R |
| | ) | |
| BRYAN BURD, | ) | |
| | ) | |
| Defendant. | ) | |

<u>**MEMORANDUM OPINION**</u>

This adversary proceeding came before the Court for trial on the merits on May 8, 2007, on the Amended Complaint to determine non-dischargeability of a debt (Adv. Doc. 24), filed by Plaintiff Exchange Bank (the "Bank") against Defendant/Debtor Bryan Burd ("Burd"). In its Amended Complaint, the Bank claims that Burd owes the Bank a debt in excess of $50,000, and that the debt is non-dischargeable pursuant to 11 U.S.C. §§ 523(a)(2) and (a)(6). Prior to the commencement of the trial, the Bank withdrew its claim under 11 U.S.C. § 523(a)(2). On May 7, 2007, the parties entered into stipulations of fact as reflected in the Amended Pre-Trial Order (Adv. Doc. 31). The Bank appeared through its Vice President, Gary Omar Bayouth ("Bayouth"), and its counsel, Forrest B. Hess, and Burd

appeared in person and through his counsel, Scott P. Kirtley. The parties presented testimony through three witnesses: Bayouth, Burd and Gary Burd.

Upon consideration of the pleadings, including stipulations contained in the Pretrial Order, the Plaintiff's Trial Brief (Adv. Doc. 32), the testimony and documentary evidence admitted at trial, the arguments of counsel and applicable law, the Court finds and concludes as follows:

**Jurisdiction**

The Court has jurisdiction of this "core" proceeding by virtue of 28 U.S.C. §§ 1334, 157(a), and 157(b)(2)(I); and Local Civil Rule 84.1(a) of the United States District Court for the Northern District of Oklahoma.

**Contentions**

The Bank alleges that Burd sold approximately ten (10) pieces of farm-related equipment without remitting the proceeds to the Bank to satisfy indebtedness in the amount of $53,806.28 that was secured by the equipment. The Bank also contends that in order to induce the Bank to make subsequent loans to Burd, Burd did not inform the Bank that the equipment had been sold. The Bank further asserts that Burd allowed the Bank's collateral to be sold by and through R&R Equipment, L.L.C. ("R&R") on behalf of Burd when Burd knew or should have known that R&R would not timely remit the sales proceeds to Burd to enable Burd to pay the respective loans. The Bank contends that Burd willfully and maliciously injured the Bank and that Burd's debt to the Bank should be deemed

nondischargeable under 11 U.S.C. § 523(a)(6). Burd denies that he willfully and maliciously injured the Bank.

**Findings of fact**

The Bank operates a bank in Skiatook, Oklahoma. Bayouth is a Vice President and a branch manager of the Bank.[1] Bayouth and Burd were neighbors and friends and have known each other for 20 to 25 years. Since 1992, Gary Burd, Burd's father, owned and operated R&R, an Oklahoma limited liability company. R&R operated its business of selling tractors and farm-related equipment in Owasso, Oklahoma. As early as 1990, Burd, like his father, began to sell used tractors and farm-related equipment. In 1996, Burd became a full time firefighter for the City of Tulsa, but he continued to sell used tractors and farm-related equipment. In 2004, Burd began selling farm-related equipment under the name "Triple B Equipment." Triple B Equipment is a "DBA" or sole proprietorship and is not an incorporated business. Because R&R had a good reputation in the business and its location was highly visible from the highway, Burd sold all of his equipment from R&R's lot. After purchasing his equipment inventory at auctions or from individuals,[2] Burd placed the equipment for sale on R&R's lot, and R&R sold the equipment on Burd's behalf. Generally, customers who purchased Burd's equipment paid R&R, and R&R remitted the sales proceeds to Burd.[3]

---

[1] Bayouth was the loan officer on the four loans that are at issue in this proceeding.

[2] Burd also accepted trade-in equipment from certain customers.

[3] At first, Burd and Gary Burd requested that customers that purchased Burd's equipment make their payments directly to "Triple B Equipment" rather than to R&R.

3

Burd had an established 15-year banking relationship with the Bank during which time the Bank made approximately 30 to 40 personal and business loans to Burd. Burd obtained numerous business loans in order to finance the purchase of used tractors and farm-related equipment for resale. Generally, the business loans were evidenced by "single-pay" notes with terms of six months to one year. In order to secure such loans, the Bank required Burd to execute a security agreement in connection with each loan whereby certain farm-related equipment and the proceeds of the sale of such equipment were pledged as collateral to secure each loan. Each of the security agreements provided that the described collateral secured all of Burd's indebtedness to the Bank.[4]

Although the Bank typically inspected its collateral one to three times per year, it did not usually inspect specific collateral before making a new loan to Burd. Bayouth testified that additional inspections were not necessary based upon the Bank's long-term relationship with Burd. Bayouth also testified that approximately twice each year, Burd furnished the Bank with a current list of the equipment that secured Burd's indebtedness to the Bank. Burd, however, testified that he never provided such a list to the Bank and the Bank never

---

However, because customers were confused by the payment arrangements, Burd determined that his customers should pay R&R and R&R would then remit the sales proceeds to Burd.

[4] Burd testified that he understood that the Bank's security interest extended to the proceeds of the sale of the Bank's collateral.

4

requested that he prepare such a list. The Bank failed to admit any such list into evidence.[5] The Court finds that Burd's testimony was credible.

The Bank did not require Burd to obtain its prior consent before he sold the equipment that secured its loans nor did the Bank require Burd to advise the Bank when he sold any particular piece of equipment or to identify the source of his loan payments. The Bank was aware that Burd sold his equipment from R&R's lot.

On September 30, 2004, Burd executed a Promissory Note (Loan #101961) in favor of the Bank in the amount of $23,370.00, with a maturity date of March 29, 2005, and the parties entered into a Security Agreement that described the collateral securing the indebtedness (collectively, "First Loan").[6] Pretrial Order at 2, Bank Exhibit 3. The First Loan was secured by a 1987 John Deere Tractor Model #2955 (Serial # 609376) and a 1981 Massey Ferguson Tractor Model #245 (Serial # 9A-327614).

In February 2005, Burd sold the two tractors that secured the First Loan for $14,400. In addition, Burd received a John Deere 2640 tractor (Serial # 259842) that the purchaser traded in. On February 15, 2005, Burd sent a facsimile to the Bank stating that he had sold the two tractors and acquired the trade-in tractor and that he would be at "the Owasso Branch before closing . . . to pay on that note." Bank Exhibit 16. On February 16, 2005, Burd made

---

[5] The Bank's Exhibit 12 (and Burd's Exhibit 2) is a list of equipment that secured the four subject loans, which was prepared by Burd after this adversary proceeding was filed in connection with the Bank's discovery requests.

[6] The Security Agreement in connection with the First Loan required that Burd obtain the Bank's prior written consent before selling the collateral securing the loan. See Bank's Exhibit 3 at 2. However, Bayouth admitted that the Bank did not require Burd to obtain its prior consent before selling any of the Bank's collateral.

5

a payment of $14,400 to the Bank on the First Loan.[7] See Burd Exhibit 11. In March 2005, R&R sold the John Deere 2640 tractor at auction on Burd's behalf.[8] See Bank Exhibit 14. The auction company remitted the proceeds of the sale of the John Deere 2640 tractor to R&R. R&R did not remit the proceeds to Burd. Burd made no further payments on the First Loan nor did he advise the Bank that the tractor had been sold. Burd testified that he did not believe that he was required to advise the Bank of the sale of collateral. Burd further testified that he did not pay the Bank the balance of the First Loan when the tractor was sold because he did not receive the proceeds from R&R.

On March 14, 2005, Burd executed a Promissory Note (Loan # 102082) in favor of the Bank in the amount of $15,120.00 with a maturity date of September 10, 2005, and the parties entered into a Security Agreement that granted the Bank a security interest in an 18 foot Car Hauler (Serial # 5GXCF18284M001846), a Massey Ferguson 230 DSL Tractor (Serial # 290465), a Toro Z Master (Serial # 992102), a Sabre Riding Lawn Mower, and a Bushog 3008 Series (Serial # 77854) to secure the indebtedness (collectively, the "Second Loan"). Bank Exhibit 4. All five pieces of equipment that secured the Second Loan were

---

[7] The Bank considered the John Deere 2640 tractor as substitute collateral to secure the balance of the First Loan. On April 11, 2005, the parties entered into an agreement titled "Substitution of Collateral" with respect to the First Loan. However, the Substitution of Collateral does not identify the collateral that is the subject of the agreement. The Substitution of Collateral references the First Loan but it was executed on the same date that the parties entered into the Fourth Loan (hereinafter defined).

[8] There is no evidence regarding the specific date in March 2005 that the John Deere 2640 tractor was sold.

sold by or through R&R on Burd's behalf to third party purchasers.[9] See Bank Exhibit 12. The third party purchasers paid R&R for the equipment, but R&R failed to remit the proceeds to Burd. Burd did not advise the Bank that its collateral had been sold. Burd did not make any payments on the Second Loan.

On March 24, 2005, Burd executed a Promissory Note (Loan #102091) in favor of the Bank in the amount of $14,520.00 with a maturity date of September 20, 2005, and the parties entered into a Security Agreement that described the collateral securing the indebtedness (collectively, the "Third Loan"). Pretrial Order at 2, Bank Exhibit 5. The Third Loan was secured by a Kuboto B7100 (Serial # 47214), two John Deere Gators (Serial # WOO42X033288 and WOO6X4X010095), and a John Deere Skid Loader (Serial # 148942). All four pieces of equipment that secured the Third Loan were sold by or through R&R on Burd's behalf to third party purchasers. One of the John Deere Gators was sold on June 18, 2005, and the Kuboto B7100 was sold on August 10, 2005. No evidence was presented regarding the dates of sale of the remaining two pieces of equipment. The third party purchasers paid R&R for the equipment purchased. R&R failed to remit the sales proceeds to Burd. Burd did not make any payments on the Third Loan.

On April 11, 2005, Burd executed a Promissory Note (Loan # 102104) in favor of the Bank in the amount of $8,520 with a maturity date of October 8, 2005, and the parties entered into a Security Agreement which granted the Bank a security interest in a Massey Ferguson 255 Tractor (Serial # 9A-324694) to secure the indebtedness (collectively, the

---

[9] There is no evidence from which to determine the dates of sale of the equipment securing the Second Loan.

"Fourth Loan"). Pretrial Order at 2, Bank Exhibit 6. The tractor was sold by and through R&R on Burd's behalf to a third party purchaser.[10] R&R failed to remit the sale proceeds to Burd. Burd did not make any payments on the Fourth Loan.

On May 31, 2005, two months after the First Loan matured, the Bank and Burd entered into a Deferral/Extension Agreement that extended the maturity date of the First Loan to November 30, 2005. The parties did not discuss the status of the Bank's existing collateral nor did the Bank inspect its collateral before executing the Deferral/Extension Agreement.

With the exception of the four loans described above, Burd did not default on his payments due on any other loans with the Bank. Burd testified that he defaulted on the four loans because R&R failed to remit to him the proceeds of the equipment securing the loans and he was not in a financial position to repay the loans without the proceeds from R&R.

During the summer of 2005, R&R was having financial difficulties. Burd made frequent attempts to collect the proceeds owed to him from R&R. Gary Burd testified that Burd requested payment from R&R at least once per week. Gary Burd believed that R&R would eventually be in a position to pay Burd the amounts that were owed once R&R's business was restructured and its sales volume increased. Burd testified that R&R had previously recovered from periods of slow sales and that he expected R&R to pay its debt to him just as it had in the past. Burd further testified that during March and April of 2005, when he obtained the Second, Third and Fourth Loans, he continued to sell his equipment

---

[10] There is no evidence of the date of sale of the equipment securing the Fourth Loan.

8

by and through R&R because he had no doubt that R&R would eventually remit an amount equal to the proceeds to him which would allow him to repay the four subject loans. Bayouth testified that he did not believe Burd was "trying to hide anything" from the Bank or "cheat the Bank out of money" and admitted that although Burd had obligations under each of the four loans, "he had reasons for not paying" the loans. Burd acknowledged that he breached his obligation to repay each of the four loans to the Bank.

At some point, R&R ceased its operations and R&R's primary creditor, Security National Bank, seized all of R&R's assets. On October 15, 2005, Burd filed a petition for relief under Chapter 7 of the Bankruptcy Code. In his Schedule B, Burd disclosed R&R's debt to him as an account receivable in the amount of $50,000 for "unpaid equipment sales." Burd Exhibit 1 at 2.

**Conclusions of law**

Exceptions to discharge are narrowly construed in favor of the debtor. See Bellco First Federal Credit Union v. Kaspar (In re Kaspar), 125 F.3d 1358, 1361 (10th Cir. 1997). The party seeking to except its claim from discharge must prove all elements of the discharge exception by a preponderance of the evidence. See Grogan v. Garner, 498 U.S. 279, 287 (1991).

Section 523(a)(6) provides that a debt is excepted from discharge if the debt is a result of "willful and malicious injury by the debtor to another entity or to the property of another entity." 11 U.S.C. § 523(a)(6). The Supreme Court has determined the scope of the "willful and malicious injury" exception. See Kawaauhau v. Geiger, 523 U.S. 57, 61 (1998). The

9

Supreme Court stated that "[t]he word 'willful' in [Section 523] (a)(6) modifies the word 'injury,' indicating that nondischargeability takes a deliberate or intentional *injury*, not merely a deliberate or intentional *act* that leads to injury." Id. at 61 (emphasis in original). In order for an action to be considered "willful" for purposes of Section 523(a)(6), the action must be intentional and the debtor must intend to injure another or the interests of another. In Geiger, the Supreme Court's description of "situations in which an act is intentional, but injury is unintended, *i.e.*, neither desired nor in fact anticipated by the debtor" as beyond the scope of Section 523(a)(6) implies the converse – that injury is intended when it is either desired or anticipated by the debtor. Geiger, 523 U.S. at 62.[11] This description is consistent with Section 8A of the Restatement (Second) of Torts which defines "intent" to mean that "the actor desires to cause [the] consequences of his act, or that he believes that the consequences are substantially certain to result from it." RESTATEMENT (SECOND) OF TORTS § 8A (1964). Thus, the willful injury requirement may be satisfied by showing that the debtor desired the consequences of his act or knew or believed that injury to the creditor, although not desired, was substantially certain to result from his actions. See Via Christi Reg'l Med. Ctr. v. Budig (In re Budig), 240 B.R. 397, 401 (Bankr. D. Kan. 1999) (finding the substantial certainty standard consistent with the requirement in Geiger that a debtor

---

[11] Without equating intentional torts with acts covered by Section 523(a)(6), the Court noted that Section 523(a)(6)'s specification of "willful and malicious injury" "triggers in the lawyer's mind the category of 'intentional torts[.]' . . . Intentional torts generally require that the actor intend 'the *consequences* of an act,' not simply 'the act itself.'" Geiger, 523 U.S. at 61-62, *quoting* RESTATEMENT (SECOND) OF TORTS § 8A, Comment *a* (1964) (emphasis in original).

10

intend to injure).[12]  A willful injury may be established by direct evidence of a specific intent to harm a creditor.  See Mitsubishi Motors Credit of America, Inc. v. Longley (In re Longley), 235 B.R. 651, 657 (B.A.P. 10th Cir. 1999) .  "Willful injury may also be established indirectly by evidence of both the debtor's knowledge of the creditor's . . . rights and the debtor's knowledge that the conduct will cause particularized injury."  Id., *citing* Pasek, 983 F.2d at 1527 (other citation omitted).

Although Geiger defined "willful," it did not define "malicious."  Courts in the Tenth Circuit have interpreted the "malicious injury" prong of Section 523(a)(6).  In Dorr, Bentley & Pecha, CPA's, P.C. v. Pasek (In re Pasek), 983 F.2d 1524 (10th Cir. 1993), the Tenth Circuit recognized "willful" and "malicious" as separate elements, but blended their definitions so as to intertwine their meanings.  Pasek stated, "[w]e believe the rule fully supported by our cases is that 'willful and malicious injury' occurs when the debtor, without justification or excuse, and with full knowledge of the specific consequences of his conduct, acts notwithstanding, knowing full well that his conduct will cause particularized injury."  Pasek, 983 F.2d at 1527.

In order to exclude a debt from discharge under the "willful and malicious" standard of Section 523(a)(6), the Bank was required to establish by a preponderance of the evidence

---

[12] Cited with approval in Via Christi Reg'l Med. Ctr. v. Englehart (In re Englehart), 229 F.3d 1163 (Table), 2000 WL 1275614, at *3 (10th Cir. 2000) (unpublished opinion) (approving subjective formulation of the substantial certainty test in Budig and Mitsubishi Motors Credit of America, Inc. v. Longley (In re Longley), 235 B.R. 651 (B.A.P. 10th Cir. 1999) and stating that "the 'willful and malicious injury' exception to dischargeability in § 523(a)(6) turns on the state of mind of the debtor, who must have wished to cause injury or at least believed it was substantially certain to occur.").

that: (1) Burd committed a wrongful and intentional act; (2) the act necessarily caused injury to the Bank; (3) the act was without just cause or excuse; and (4) Burd acted with the specific intent to cause injury to the Bank or knew or believed that injury to the Bank, although not desired, was substantially certain to occur as a result of his actions.  See Geiger, 523 U.S. at 61-64; Budig, 240 B.R. at 401.

Even if, as the Bank alleges, Burd committed a wrongful and intentional act when he continued to allow R&R to sell the Bank's collateral without notice to the Bank after R&R failed to remit sales proceeds from prior sales to Burd, the Bank failed to establish that (1) Burd acted with specific intent to cause injury or knew that injury to the Bank was substantially certain to occur and (2) Burd's actions were without just cause or excuse.

Based upon the history of transactions between Burd and R&R, Burd believed that he would eventually receive from R&R an amount equal to the proceeds of the sale of the Bank's collateral, which would allow him to repay each of the four loans.[13]  The Bank failed to present any evidence that Burd subjectively intended to injure the Bank when he allowed the collateral to be sold through the auspices of R&R.  There is no evidence that Burd participated in or acquiesced in R&R's application of the proceeds to its own use nor is there any evidence that Burd personally benefitted from the sale of the collateral to the detriment of the Bank.  It is undisputed that Burd made diligent efforts to collect the proceeds from R&R.  Because R&R failed to properly remit the sales proceeds to Burd, Burd could not

---

[13] Burd testified that there was no doubt in his mind that R&R would remit the sales proceeds to him based upon his history of dealing with his father and R&R.

transmit the proceeds to the Bank. The Bank admitted that Burd was not "trying to hide anything" and that Burd "had reasons for not paying" the Bank. Thus, although the Bank was injured when its collateral (the proceeds) was dissipated by R&R, the Bank failed to prove that <u>Burd</u> committed any wrongful act with an intention to cause the Bank harm.

The Bank also argued that in order to induce the Bank into entering into the Deferral/Extension Agreement with respect to the First Loan and to induce the Bank into making other loans to Burd, Burd did not advise the Bank that collateral securing existing outstanding loans had been sold.[14]

Even if, as the Bank alleges, Burd committed a wrongful and intentional act when Burd failed to advise the Bank of the status of its collateral on existing loans before entering into the Deferral/Extension Agreement or subsequent loans, the Bank failed to establish that Burd acted with specific intent to cause injury or knew that injury to the Bank was substantially certain to result and that Burd's actions were without just cause or excuse.

The Bank elected not to inspect its collateral before making subsequent loans to Burd and before executing the Deferral/Extension Agreement with respect to the First Loan. The

---

[14] The Bank failed to specify which collateral had been sold without notice to the Bank and which loan(s) the Bank was "induced" into entering. The evidence established that at the time the parties executed the Deferral/Extension Agreement with respect to the First Loan (May 31, 2005), the John Deere 2640 tractor that secured the First Loan had been sold in March 2005, without notice to the Bank. There is no evidence as to the exact date in March 2005, that such tractor was sold. Thus, the evidence does not support a finding that the Bank was "induced" into advancing the Second and/or Third Loans (dated March 14, 2005, and March 24, 2005, respectively) because such loans could have been entered into prior to the sale of the tractor. The evidence establishes that only the John Deere 2640 tractor had been sold without notice to the Bank prior to the date the parties entered into the Fourth Loan.

13

Bank did not require Burd to advise the Bank when he sold any particular piece of equipment or to identify the source of the loan payments. Although Burd acknowledged that the Bank had a security interest in the proceeds of the sale of the Bank's collateral and that the proceeds should have been utilized to pay the indebtedness on the respective loans, he never received the proceeds from R&R. At the times Burd entered into the Deferral/Extension Agreement and the Fourth Loan, Burd still believed that R&R would pay him for the collateral it sold, and Burd intended to pay the Bank upon his receipt of the proceeds from R&R.

**Conclusion**

The Bank failed to sustain its burden of proving that Burd's debt to the Bank should be excepted from discharge pursuant to Section 523(a)(6) of the Bankruptcy Code. Based upon the foregoing, the Court concludes that Burd's debt to the Bank is dischargeable and therefore judgment should be entered in favor of Burd and against the Bank. A separate judgment consistent with this Memorandum Opinion will be entered contemporaneously herewith.

**SO ORDERED** this 17th day of August, 2007.

DANA L. RASURE, CHIEF JUDGE
UNITED STATES BANKRUPTCY COURT